# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CHARITY MOORE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:19-cv-00879-SGC |
| | ) | |
| CITY OF HOMEWOOD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION[1]

This is an employment discrimination lawsuit filed by Charity Moore ("Moore") and LaShawn Smith ("Smith") concerning their treatment as police dispatchers for the City of Homewood ("Homewood"). Presently pending is the motion to dismiss filed by Homewood and the other defendant, Steve Sparks ("Sparks"). (Doc. 26). The motion, aimed at all claims presented in Plaintiffs' Second Amended Complaint, is fully briefed and ripe for adjudication. (Docs. 27, 29-30). For the reasons explained below, the motion is due to be granted in its entirety.[2]

---

[1] All parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C § 636(c). (Doc. 8).

[2] This conclusion should not be interpreted as an endorsement of the conduct Plaintiffs allege. Indeed, the Second Amended Complaint describes a dysfunctional workplace staffed with petty, unprofessional, and mean-spirited supervisors and co-workers. However, none of the allegations—whether considered individually or cumulatively—entitle Plaintiffs to relief under the statutes and constitutional principles invoked.

## I.     STANDARD OF REVIEW

Rule 8 of the *Federal Rules of Civil Procedure* provides the requisite pleading standards for actions in federal courts.  A motion to dismiss under Rule 12(b)(6) of the *Federal Rules of Civil Procedure* requires an evaluation of the sufficiency of the complaint in light of Rule 8's pleading requirements.  Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While "detailed factual allegations" are not required by Rule 8, "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" is required to survive a motion to dismiss under Rule 12(b)(6) of the *Federal Rules of Civil Procedure*.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  A two-part test is used to evaluate the sufficiency of a complaint.  First, "the court should eliminate any allegations in the complaint that are mere legal conclusions."  *Shanks v. Potter*, 451 F. App'x 815, 817 (11th Cir. 2011) (citing *Iqbal*, 556 U.S. at 678).  Next, the court should "assume the veracity of the well-pleaded factual allegations and determine whether they 'plausibly suggest an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'"  *Id.* at 679 (quoting FED. R. CIV. P 8(a)(2)) (alterations incorporated).

## II.   PROCEDURAL BACKGROUND

Plaintiffs initiated this matter on June 7, 2019, asserting four counts against Homewood.  (Doc. 1).  On June 21, 2019, Plaintiffs filed an Amended Complaint reasserting the allegations and claims contained in the original complaint, alleging additional facts, and adding Sparks—then the dispatch supervisor—as a defendant; the Amended Complaint asserted a total of ten counts.  (Doc. 5).  On June 26, 2019, Defendants filed a motion to dismiss the Amended Complaint.  (Doc. 6).  After the first motion to dismiss was briefed (Docs. 7, 12, 15), Plaintiffs filed the Second Amended Complaint (Doc. 22), having received right to sue letters from the Equal Employment Opportunity Commission (the "EEOC").[3]  Incorporated into the Second Amended Complaint was a request for leave to amend, which the court granted, construing it as a motion under Rule 15(a)(2) of the *Federal Rules of Civil Procedure*.  (Doc. 24).  The order granting leave to amend also mooted the then-

---

[3] Plaintiffs each filed charges of discrimination with the EEOC on May 17, 2019.  (Doc. 22 at 1).

pending motion to dismiss, which was aimed at the non-operative complaint.  (*Id*.).
The instant motion, which also includes a motion to strike portions of the Second
Amended Complaint, followed.  (Doc. 26).

## III.   FACTUAL ALLEGATIONS

Plaintiffs are both Black women employed by Homewood as dispatchers for
the Homewood Police Department (the "Department"); Sparks, who is White, was
their supervisor until September 2019.  (Doc. 22 at 5, 13, 30).  In general terms, the
Second Amended Complaint asserts claims for racial discrimination and retaliation,
as well as violations of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (the
"FLSA"), and the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* (the
"FMLA")  (Doc. 22).  Before turning to the facts pertinent to Moore's and Smith's
individual claims, the court will set forth their common allegations concerning the
Department's alleged culture of indifference to, or acceptance of, discrimination.

Moore and Smith contend they did not receive any specific training regarding
discrimination policies or grievance procedures when they were hired in 2014 and
2015, respectively.  (Doc. 22 at 8-9).  In July 2016, the Department did conduct a
meeting at which discrimination policies were discussed.  (*See id* at 8-9).  However,
Smith did not attend the meeting due to either her pregnancy or childcare
responsibilities; this was the only such meeting of which Plaintiffs were ever aware.
(*Id*.; *see id.* at 29).  Department employees have access to a policy and procedure

manual (the "Manual"), which includes a three-sentence-long, generic anti-discrimination provision.  (*Id.* at 9-10).  However, the Manual does not include a comprehensive anti-discrimination policy and does not describe the grievance process; instead, it refers to other materials which Plaintiffs allege they were never provided.  (*Id.* at 10).  Plaintiffs contend the Manual's grievance process is onerous, requiring employees to complete three different grievance forms; the identity of one of these forms is unclear; and the Manual does not explicitly identify the location of another form.  (*Id.* at 10, 28).

The Second Amended Complaint describes multiple incidents—not involving Plaintiffs—occurring within the Department since 2015: (1) a former Department Chief ordering Black officers to report to work during a July 2015 vigil for a Black teen who died in Homewood's custody; (2) a Black officer filing an EEOC charge in 2015, alleging he was passed-over for promotion; (3) a July 2016 meeting to address racial tensions in which the new Department Chief promised to encourage diversity but which has not resulted in any changes; (4) the 2016 promotion and commendation of an officer with a history of making offensive, racially discriminatory comments despite supervisors' knowledge of his conduct; and (5) the 2018 promotion of a White Sergeant who had previously told a Black officer "racial bias in America is all b.s. and all propaganda."  (Doc. 22 at 5-8).

The Second Amended Complaint also describes a 2019 incident in which a Black officer found a Confederate flag and noose on his work desk. (Doc. 22 at 31). Plaintiffs allege the Department Chief investigated the matter and formed an opinion of the perpetrator's identity; however, the offender was merely transferred to a different division and was not disciplined. (*Id.* at 31-32). Moreover, the Black officer who found the Confederate flag and noose subsequently found his patrol motorcycle smeared with feces; he later found a jar on his desk labeled "Whiny Bitch Tears." (*Id*. at 32). Plaintiffs allege the Department Chief took no action to discover the perpetrator. (*Id.*). Plaintiffs characterize these actions, together with the Manual's inadequate anti-discrimination policy, as Homewood's deliberate indifference to workplace discrimination. (*Id.* at 8-12, 32).

Having set out the allegations common to Plaintiffs, the allegations pertaining to their individual claims are addressed in turn, below.

### A.   Charity Moore

Moore has been employed as a Homewood police dispatcher since 2015. (Doc. 22 at 5). Moore's problems started when she returned from maternity leave in April 2017; she notified Sparks she would need a private place to express breast milk. (*Id.* at 19-20). A year and a half prior to Moore's request, a White Department employee working in the same building was given a cleaned-out closet to use as a private place to pump breast milk. (*Id.*). Despite Moore's request, Sparks instructed

Moore to pump at her desk in the dispatch room and to place a sign on the door as needed. (*Id*. at 20). The dispatch room required an access code to enter; however, Sparks, other dispatchers, and occasionally officers with the code would come and go as they pleased despite Moore's sign on the door. (*Id.*). Between May and July 2017, several White male officers made offensive comments about Moore pumping, such as comparing her to a cow and stating other officers would like to purchase her breast milk. (*Id.*). The frequency of the offensive comments led one concerned officer to ask if Moore was okay. (*Id.*).

Moore complained to Lieutenant Andrew Didcoct and Sparks about the offensive comments and again requested a private place to pump in late May 2017. (Doc. 22 at 21). Lieutenant Didcoct said he would look into it but did not. (*Id.*). In June or July 2017, Department officers were given the access code to the dispatch room, resulting in more traffic. (*Id.* at 21). This coincided with a period in which the Department hired more officers but not more dispatchers, meaning Moore had few opportunities to leave her desk or find a private area to pump. (*Id.* at 21-22). There was also a closed-circuit camera in front of Moore's desk. (*Id.* at 22).

On July 20, 2017, Moore emailed Sparks requesting a private space, mentioning the woman who had previously been given a private area to pump and stating federal law required employers to provide a private location other than a restroom. (Doc. 22 at 22-23). In reply, Sparks erroneously stated it was the first

time he had been notified of Moore's need for a private area. (*Id.* at 22). Sparks stated there were limited options for privacy but offered the women's bathroom/locker room as an area Moore could use. (*Id.* at 22-23). In October 2017, a sewage leak forced Moore to move to a temporary desk located close to the dispatch room's entry door; the desk was unshielded from the view of many employees and visitors in the squad room. (*Id.* at 23). This desk, the bathroom/locker room, and Lieutenant Didcoct's windowed office were the only locations Sparks and the Department offered Moore to pump breast milk. (*Id.*).

In February 2019, Moore was diagnosed with a tumor in her lower paraspinal process. (Doc. 22 at 12). Moore gave Sparks an excuse from her doctor on February 12, 2019; Sparks threatened to not accept the doctor's excuse without further explanation. (*Id.* at 12-13). Moore followed-up with her primary physician and on February 14, 2019, submitted additional information to Sparks, together with FMLA paperwork. (*Id.* at 13). Moore contends White Department employees are not subject to this sort of additional scrutiny. (*Id.*). During a February 15, 2019 telephone conversation with Lieutenant Keith Peterson, Moore noted and questioned this double-standard. (*Id.*). Peterson stated he would look into it, but Moore did not hear back from him. (*Id.*).

Moore alleges Sparks has subjected her to "heightened, onerous scrutiny compared to her white co-workers" regarding accommodations under the FMLA and

Americans with Disabilities Act ("ADA") since February 2019.  (Doc. 22 at 14).
After Moore notified Sparks of her condition, Sparks required her to undergo a "Fit
for Duty" assessment; Moore contends White employees who contemporaneously
experienced health problems—ranging "from pregnancy to elective surgery"—were
not subject to the same assessment.  (*Id.*).  In April 2019, Sparks notified Moore she
would need to work in excess of her doctor's prescribed limitations.  (*Id.* at 15).
Within three days of telling Sparks she would need to first check with her doctor,
Moore was subjected to a drug test—her first drug screening since being employed
as a dispatcher with the Department.  (*Id.*).  On May 3, 2019, Moore emailed Sparks,
contending she was subjected to a race-based double standard.  (*Id.*).  Sparks did not
acknowledge this email complaint.  (*Id.*).

Moore alleges the following facts but does not state when the events occurred;
it is safe to say they occurred at some point after February 2019.  Lieutenant Peterson
called Moore and said her doctor needed to amend her FMLA limitations to allow
her to work more hours.  (Doc. 22 at 25).  Sparks also called Moore to say she needed
to work more hours to accommodate two White dispatchers who were taking time
off—one to care for a new baby and the other for elective surgery.  (*Id.*).  Sparks
also told Moore that he did not like her having longer, "FMLA-agreed upon
weekends."  (*Id.*).  Sparks—apparently with Lieutenant Peterson's approval—
emailed Moore, altering her work schedule so she would not have consecutive days

off.  (*Id.* at 25-26).  Peterson also allowed Sparks to schedule Moore "as needed." (*Id*. at 26).

On June 18, 2019, while searching Homewood's employee-only intranet system to find information about long-term disability policies, Moore stumbled across the Homewood handbook (the "Handbook") nestled among other miscellaneous forms.  (Doc. 22 at 27).  The Department never notified Moore—or Smith—of the Handbook's existence.  (*Id.* at 28-29). The Handbook included a more comprehensive discrimination policy than the one in the Manual.  (*Id*. at 27).

Sparks stepped down as dispatch supervisor on September 17, 2019.  (Doc. 22 at 30).  On the same day, the Department received an anonymous complaint concerning an Instagram video Moore had posted more than two years earlier in conjunction with her advocacy for breastfeeding mothers in Alabama.  (*Id.*).  Moore was written-up by the Department as a result of the video.  (*Id.*).  Moore alleges this treatment varies from the Department's treatment of an unnamed White officer in approximately 2015; she alleges the officer made a pornographic video and invited various Department employees to view it.  (*Id.*).  Moore further alleges the officer was not disciplined.  (*Id.*).  Finally, Moore alleges Sparks and a White sergeant had "posted bigoted and/or violence-steeped 'memes' on Social Media, but have never been disciplined by the HPD."  (*Id.* at 31).

Based on the foregoing allegations, Moore delineates eight claims—one against Sparks and seven against Homewood.  (Doc. 22 at 33-40).  Against Homewood Moore asserts: (1) "Violation(s) of Civil Rights Under Color of Law—General" (Count I); (2) "Violation of Civil Rights Under Color of Law—Retaliation," alleging racial discrimination concerning her exercise of rights under the ADA and FMLA (Count II); (3); violations of nursing mother accommodations under 29 U.S.C. § 207(r) (Count VI); (4) a 42 U.S.C.§ 1983 claim based on nursing mother accommodations (Count VII); (5) violations of the FMLA (Count VIII); (6) a § 1983 claim based on the FMLA violations (Count IX); and (7) a Title VII claim for racial discrimination (Count XI).  As to Sparks, Moore asserts a single claim for racial discrimination under § 1983 (Count V).

### B.   LaShawn Smith

The Department has employed Smith as a dispatcher since 2014.  (Doc. 22 at 5).  In mid-February 2019, Smith asked Sparks if she could leave work early because she was feeling ill.  (*Id.* at 16).  After Sparks refused Smith's request, she began experiencing what she believed was a panic attack.  (*Id.*).  Smith called Homewood's Employee Assistance Program for advice and was told to go to the emergency room.  (*Id.* at 17).  When Smith notified Sparks, he arrived at the dispatch office with Department officers who escorted Smith "off Homewood city property."  (*Id.*).

Smith then went to an urgent care center where it was confirmed she "had and/or was" experiencing a panic attack.  (*Id.*).

Smith alleges it was not unusual for unnamed White dispatchers to request to "go home sick" or leave work early.  (Doc. 22 at 16).  Smith has not observed Sparks "make a fuss" about these requests.  (*Id.*).  Accordingly, Smith contends the February 2019 incident constitutes disparate treatment on the basis of her race.  (*Id.* at 17).

Based on these allegations, Smith asserts four claims—one against Sparks, and three against Homewood.  (Doc. 22 at 34-41).  As to Homewood, Smith asserts: (1) "Violation(s) of Civil Rights Under Color of Law—General" (Count III); (2) "Violation of Civil Rights Under Color of Law—Retaliation" on the basis of race (Count IV); and (3) a Title VII claim for racial discrimination (Count XII).  As to Sparks, Smith asserts a single claim for racial discrimination under § 1983 (Count X).

## IV.   DISCUSSION

Plaintiffs both assert claims for race-based discrimination and retaliation. These claims are addressed before moving to Moore's claims under the FMLA and FLSA.

### A.    <u>Claims Based on Race</u>

Regarding race-based claims, Plaintiffs each assert a Title VII claim against Homewood and a § 1983 claim against Sparks.  Additionally, Plaintiffs both assert

claims against Homewood for "Violation(s) of Civil Rights Under Color of Law," alleging both racial discrimination and retaliation.  Plaintiffs' invoke § 1983 as their vehicle for asserting violations of § 1981 and violations of the Equal Protection Clause of the Fourteenth Amendment against Homewood and Sparks.  *See, e.g., Webster v. Fulton Cty., Ga.*, 283 F.3d 1254, 1256 (11th Cir. 2002); *Potter v. Williford*, 712 F. App'x, 953, 954 (11th Cir. 2017).

Claims alleging racial discrimination in violation of the Equal Protection Clause, § 1981 (via § 1983), and Title VII are all subject to the same analytical framework.  *See Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019); *McElroy v. Alosi*, No. 03-2662, 2006 WL 8436736, at *4 (N.D. Ala. Mar. 6, 2006) ("When § 1983 is used as 'a parallel remedy' for discriminatory denial of employment rights conferred by § 1981 or Title VII, the elements of the § 1983 claim are the same as those for § 1981 or Title VII.").  "Although a Title VII complaint need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case, it must provide enough factual matter (taken as true) to suggest intentional race discrimination."  *Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008).

On this guidance, courts have dismissed disparate treatment claims under Rule 12(b)(6) where the complaint did not plausibly allege the plaintiff suffered an adverse employment action—one of the requirements of a prima facie case under

*McDonnel Douglass*. *Hudson v. Univ. of Ala. Healthcare Sys.*, No. 16-0026, 2016 WL 4132274, at *3 (S.D. Ala. Aug. 3, 2016) ("to survive a motion to dismiss under Rule 12(b)(6), the amended complaint must contain allegations reflecting the existence of one or more adverse employment actions"); *Hopkins v. Saint Lucie Cty. Sch. Bd.*, 399 F. App'x 563, 565 (11th Cir. 2010) (affirming 12(b)(6) dismissal for failure to allege adverse employment action); *Chapman v. U.S. Postal Serv.*, 442 F. App'x 480, 484 (11th Cir. 2011) (same); *see Davis v. Town of Lake Park*, 245 F.3d 1232, 1246 (11th Cir. 2001), *overruled on other grounds as recognized by Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) ("Adverse employment action is an indispensable element of a Title VII plaintiff's case.").

"For disparate treatment, an adverse employment action must 'impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way.'" *Minnifield v. City of Birmingham Dep't of Police*, 791 F. App'x 86, 90 (11th Cir. 2019) (quoting *Davis*, 245 F.3d at 1239). "Generally, an adverse employment action requires a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *McCone v. Pitney Bowes, Inc.*, 582 F. App'x 798, 800 (11th Cir. 2014). "Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's

employment." *Davis,* 245 F.3d at 1239.  An objective standard is used to determine the adversity of the employment action: "the employment action must be materially adverse as viewed by a reasonable person under the same circumstances." *Id.*

To succeed on a retaliation claim, the plaintiff is not required to "prove the underlying claim of discrimination." *Taylor v. Runyon*, 175 F.3d 861, 869 (11th Cir. 1999).  "An employee's complaint about discrimination constitutes protected activity if the employee could 'reasonably form a good faith belief that the alleged discrimination existed.'" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (quoting *Taylor*, 175 F.3d at 869).  As with discrimination claims, a plaintiff alleging retaliation is not required to satisfy the *McDonnell Douglas* tripartite test at the pleading stage.  *See Marshall v. Mayor & Alderman of City of Savannah, Georgia*, 366 F. App'x 91, 100 (11th Cir. 2010).  However, the plaintiff must plead enough factual allegations to at least suggest discriminatory retaliation.  *Id.* Accordingly, courts have dismissed retaliation claims under Rule 12(b)(6) for failing to plausibly allege an adverse employment action.  *Bell v. Ala. Dep't of Transp.*, No. 18-1122-MHH, 2021 WL 100799, at *1 (N.D. Ala. Jan. 12, 2021) (proper pleading of retaliation claim includes allegations of an adverse employment action); *Chapman.*, 442 F. App'x at 484 (affirming dismissal of retaliation claim where plaintiff failed to plead adverse employment action).  In the context of retaliation, an adverse employment action is one which would have "dissuaded a reasonable

worker from making or supporting a charge of discrimination" to the EEOC, the courts, or their employers.  *White*, 548 U.S. at 68.

Plaintiffs' individual race-based claims are addressed in turn.

### 1.    LaShawn Smith

All of Smith's claims are based on the single incident in mid-February 2019, when Sparks refused her request to leave work early.  When Homewood's Employee Assistance Program advised Smith to go to the emergency room for what she believed was a panic attack, Sparks arrived at the dispatch office with Department officers; they escorted Smith to her vehicle.  Plaintiff Smith then went to an urgent care center where it was confirmed she had experienced a panic attack.

Smith alleges the foregoing constitutes racial discrimination because Sparks has allowed White dispatchers to leave work early.  (Doc. 22 at 16-17).  However, even accepting the allegations in the complaint as true, Smith has not alleged any activities which impacted the terms, conditions, or privileges of her job "in a real and demonstrable way."  *Minnifield*, 791 F. App'x at 90 (quoting *Davis*, 245 F.3d at 1239).  Indeed, the Second Amended Complaint does not include any allegations a reasonable person would interpret as materially adverse, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *McCone*, 582 F. App'x at 800.

First, refusing an employee's request to leave work early does not constitute an adverse employment action for purposes of a disparate treatment claim. *Cf. Entrekin v. City of Panama City, Fla.*, 376 F. App'x 987, 995 (11th Cir. 2010) (in context of retaliation claim, refusal to let employee leave work early constituted merely a trivial harm and/or a petty slight). The same is true regarding Smith's allegation that she was escorted to her vehicle by two Department officers. *See Moore-Williamson v. Mercer Univ.*, No. 05-0140, 2007 WL 737520, at *10 (M.D. Ga. Mar. 7, 2007) ("While Williamson may have subjectively perceived being escorted off of the premises . . . as demeaning or humiliating, this subjective belief is insufficient to establish the adversity of Mercer's actions."). Accordingly, Smith's claims for racially disparate treatment (Counts III, X, & XII) fail.

Next, the same allegations form the basis of Smith's retaliation claim. This claim fails for multiple, independently sufficient reasons. First, Smith does not allege that she engaged in any protected activity. While Smith speculates that Sparks denied her request to leave work early due to her race, the Second Amended Complaint does not allege that Smith contemporaneously indicated to Sparks or anyone else that the refusal was racially discriminatory. Next, as with Smith's disparate treatment claim, she cannot show an adverse employment action for purposes of retaliation. Neither the denial of Smith's request to leave early, nor escorting her to the parking lot, constitute adverse employment actions. *See*

*Entrekin*, 376 F. App'x at 995; *cf. Moore-Williamson*, 2007 WL 737520, at *10. Accordingly, Smith's claim for retaliation (Count IV) fails.

For the foregoing reasons, Smith fails to state a claim for discrimination or retaliation, and Defendants' motion to dismiss is due to be granted as to her claims.

## 2.    Charity Moore

Moore also asserts claims for discrimination and retaliation.  As with Smith, Moore has failed to plausibly allege she suffered an adverse employment action.

### a.    Discrimination

Like Smith, Moore does not allege any discrimination overtly based on her race.  Rather, Moore's claims for racial discrimination are based on how Homewood treated her with regard to nursing mother accommodations under the FLSA in 2017 and accommodations under the FMLA in 2019.  The same facts used to show a statutory violation can also be used to show race discrimination, as long as the allegations independently support the elements of discrimination.  *See Jeter v. Montgomery Cty.*, 480 F. Supp. 2d 1293, 1301 (M.D. Ala. 2007) (denying motion to dismiss and noting: (1) "a § 1983 claim asserting race discrimination in pay may be pursued alongside an FLSA claim"; (2) plaintiffs can "pursue a § 1983 claim independent of their FLSA claims if they 'are not attempting to argue that the violation of the FLSA is also a violation of the Equal Protection Clause, but are instead asserting a constitutional claim based on wage differences between the

Plaintiff employees and other state employees'"; (3) and "'it is conceivable that if similarly situated persons are treated differently, an Equal Protection claim may be established even if the Plaintiffs would not be entitled to overtime under the FLSA.'") (alteration incorporated) (*quoting Jarret v. Alexander*, 235 F. Supp. 2d 1208, 1210-11 (M.D. Ala. 2002).

The Second Amended Complaint describes multiple incidents from 2017 and 2019 which Moore may contend constitute adverse employment actions. Regarding problems with Moore's nursing mother accommodations in 2017, the Second Amended Complaint alleges her repeated requests for a private, non-bathroom location to express breast milk were not honored. Instead, Sparks gave Moore the options of pumping: (1) at her desk in the dispatch room, placing a sign on the door as-needed; (2) in the women's locker-room/bathroom; or (3) in Lieutenant Didcoct's office. Additionally, the already unsatisfactory, non-private option of pumping at Moore's desk was even less private after: (1) June or July 2017, when more officers had access and entered the dispatch room; and (2) October 2017, when she temporarily had to move to a desk near the entrance to the dispatch room.

While these conditions run afoul of those specified to protect nursing mothers under the FLSA, they do not constitute adverse employment actions for purposes of Moore's claims alleging racial discrimination. *See Martinez v. City & Cty. of Denver*, No. 17-3140, 2019 WL 1505873, at *8 (D. Colo. Apr. 5, 2019) (on summary

judgment, concluding the following actions did not constitute adverse employment actions under Title VII: (1) prohibiting plaintiff from using vacant office to express breast milk; (2) superior saying plaintiff "should not have to work while expressing breast milk"; (3) reprimanding plaintiff for tardiness, behavior, and performance; and (4) denying plaintiff funds for training). Accordingly, Moore has not alleged an adverse employment for purposes of her disparate treatment claim with regard to expressing breast milk at work in 2017.

Regarding Moore's problems related to her 2019 cancer diagnosis and her FMLA status, the Second Amended Complaint alleges the following incidents. When Moore initially provided a doctor's excuse on February 12, 2019, Sparks threatened not to accept it without further explanation. Two days later, Moore followed-up with her primary physician, submitting additional information to Sparks, together with FMLA paperwork. Soon thereafter, Sparks required Moore to undergo a "Fit for Duty" assessment. In April 2019, Sparks notified Moore she would need to work in excess of her doctor's prescribed limitations, to which Moore responded she would need to check with her doctor. Three days later, Moore was subjected to a drug test—her first drug screening since being employed with the Department. At some point after February 2019: (1) Lieutenant Peterson told Moore her doctor needed to amend her FMLA limitations to allow her to work more hours; (2) Sparks called Moore to say she needed to work more hours to accommodate two

White dispatchers who were taking time off; (3) Sparks told Moore he did not like her having longer weekends; and (4) Sparks—apparently with Lieutenant Peterson's approval—altered Moore's work schedule so that she would not have consecutive days off.  At some point after September 17, 2019, Moore was written up for an Instagram video she had posted more than two years earlier.

To the extent Moore relies on the foregoing allegations to show her attempts to secure her rights under the FMLA were subject to greater scrutiny than those of White employees, she has not alleged any adverse employment actions.  Sparks initially threatened not to accept Moore's doctor's excuse, but it appears he ultimately did accept it after receiving additional information from Moore's primary physician.  This does not constitute an adverse employment action.  *See Blackledge v. Ala. Dep't of Mental Health*, No. 06-0321, 2007 WL 3124452, at *30 (M.D. Ala. Oct. 25, 2007) (in context of a retaliation claim, requiring employee to submit doctor's excuse prior to approving leave was "minor annoyance" which did not constitute adverse employment action); *Hicks v. Alabama*, 45 F. Supp. 2d 921, 927 (S.D. Ala. 1998) (having to submit doctor's excuse for an absence was not adverse employment action).

The same analysis applies to the extent Moore relies on not having consecutive days off, being written up, or being subject to a drug test and fit for duty evaluation.  *Vidovic v. City of Tampa*, No. 16-0714, 2017 WL 10294807, at *7 (M.D.

21

Fla. Oct. 12, 2017) (being subjected to fit for duty testing was not adverse employment action); *Yelling v. St. Vincent's Health Sys.*, No. 17-01607-SGC, 2020 WL 7059450, at *10 (N.D. Ala. Dec. 2, 2020) ("merely being subjected to a drug test does not constitute an adverse employment action"); *Watters v. Metals*, No. 14-0483-TMP, 2016 WL 1243758, at *5 (N.D. Ala. Mar. 30, 2016) (in context of Title VII claim, a "drug test itself was not an adverse employment action"); *Hodges v. Vectrus Sys. Corp.*, No. 19-0329, 2020 WL 2245123, at *4 (M.D. Ala. May 7, 2020) (granting motion to dismiss and holding denial of certain days off did not constitute adverse employment action); *Dixon v. Palm Beach Cty. Parks & Rec. Dep't*, No. 07-80528, 2009 WL 200013, at *4 (S.D. Fla. Jan. 26, 2009) (in context of retaliation claim, denial of particular days off did not constitute adverse employment action); *Isaac v. Sch. Bd. of Miami-Dade Cty., Fla*, No. 00-0890, 2002 WL 31086118, at *11 (S.D. Fla. Sept. 3, 2002) (being written up was not an adverse employment action).

Moore's remaining allegations are sufficient to show her supervisors did not like the fact of her FMLA restrictions.  However, while the Second Amended Complaint alleges Moore's supervisors told her she needed to work more hours, it does not appear she actually did work more hours.  Nor—crucially—does the complaint allege Moore suffered any adverse employment action as a result. Nothing in the complaint alleges the insufficient nursing mother accommodations or FMLA-related incidents caused a "significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *McCone*, 582 F. App'x at 800.

For the foregoing reasons, Moore has failed to state a disparate treatment claim.

        b.   <u>Retaliation</u>

As with her claims for racial discrimination, Moore asserts Defendants retaliated against her—on the basis of her race—for attempting to secure her rights under other federal statutes (Count II). Here, the complaint specifically refers to Moore's efforts with regard to the FMLA and ADA. (Doc. 22 at 33). However, none of the allegations discussed in the preceding section constitute an adverse employment action for purposes of retaliation. *Blackledge*, 2007 WL 3124452, at *30 (requiring employee to submit doctor's excuse prior to approving leave insufficient to show adverse employment action in context of retaliation claim); *McQueen v. Ala. Dep't of Transp.*, 769 F. App'x 816, 824 (11th Cir. 2019) (same with regard to drug test); *Crowley v. Johnson*, No. 13-1634, 2015 WL 1500641, at *18 (S.D.N.Y. Mar. 31, 2015), *aff'd,* 647 F. App'x 14 (2d Cir. 2016) (same with regard to fitness test); *Dixon*, 2009 WL 200013, at *4 (same with regard to denial of particular days off); *Edwards v. Nat'l Vision Inc.*, 568 F. App'x 854, 862 (11th Cir.

2014) (same with regard to write-up); *Dexter v. Amedisys Home Health, Inc. of Ala.*, 965 F. Supp. 2d 1280, 1294 (N.D. Ala. 2013) (same with regard to write-up).[4]

For the foregoing reasons, Moore has failed to state a claim for retaliation.

### B.   Moore's Remaining Claims

Moore's remaining claims, asserting FLSA and FMLA violations, are addressed in turn.

#### 1.   FLSA

Moore's FLSA claims rest on her allegations concerning Homewood's failure to provide a private place for her to express breast milk.  Under the FLSA, employers must provide "a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk." 29 U.S.C § 207(r)(1)(A).  Moreover, an employer must provide "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk." *Id.* at § 207(r)(1)(B).

---

[4] Count II does not allege retaliation based on Plaintiff's nursing mother accommodations under the FLSA in 2017.  Even if it did, those claims would fail.  Moore's initial request for a private place to pump breast milk was in April 2017.  (Doc. 22 at 19-20).  That request was not honored. In May 2017 Moore complained to Didcoct and Sparks regarding offensive comments and again requested an accommodation.  (*Id.* at 21).  On July 20, 2017, Moore emailed Sparks, again requesting a private area, and also noting a White employee had previously been given a private area to pump.  (*Id.* at 22-23).  Even if each of Moore's requests constitute protected activity, the Second Amended Complaint does not allege Defendants retaliated against her on this basis—they merely continued to not honor her legitimate request for a private location.  *See Dixon*, 2009 WL 200013, at *5 (status quo denial of requests does not constitute retaliation).

The remedies available for violations of § 207(r) are provided elsewhere in the FLSA.  *See* 29 U.S.C. § 216(b).  Specifically, employers who violate § 207(r) "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  *Id.*  "The Eleventh Circuit has yet to rule on the issue of damages recoverable under § 207(r)."  *Poague v. Huntsville Wholesale Furniture*, 369 F. Supp. 3d 1180, 1199, n.9 (N.D. Ala. 2019).  However, courts interpreting § 207(r) have found "employees may only recover for unpaid minimum wage or overtime wages due as a result of a violation of § 207(r)."  *Id.* at 1199; *see Hicks v. City of Tuscaloosa*, No. 13-2063-TMP, 2015 WL 6123209, at *28 (N.D. Ala. Oct. 19, 2015) ("No alternative right to damages beyond minimum wages or overtime pay is provided for plaintiffs asserting a right under § 207(r)(1). Accordingly, § 216(b) renders § 207(r)(1) virtually useless in almost all practical application.").

Moore repeatedly and unsuccessfully requested a private place to express breast milk.  The allegations in the Second Amended Complaint are sufficient to show Homewood did not comply with its duty under the FLSA to provide a private location for Moore to pump.  However, Moore has not stated an FLSA claim because she does not allege she is owed wages or overtime compensation.  Instead, the only

damages Moore alleges are "privations, physical and emotional damages." (Doc. 22 at 37).

Moore argues the Department of Labor has interpreted the remedies available for violations of § 207(r) as not limited to unpaid wages or overtime, under the FLSA's antiretaliation provision—§ 215(a)(3). (Doc. 29 at 20-21).[5] As previously discussed, the Second Amended Complaint fails to state a claim for retaliation because it fails to allege any adverse employment actions. Accordingly, for whatever the fact sheet is worth, it is does not apply to give Moore a remedy under § 216(b) beyond unpaid wages and/or overtime.

For the foregoing reasons, the Second Amended Complaint fails to state a claim under the FLSA.

### 2.    FMLA Interference[6]

The FMLA aims, in part, "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601. In Count VIII, Moore claims Homewood interfered with her FMLA rights. To state a claim for FMLA interference, "a

---

[5] Moore's arguments in this regard are based on a fact sheet posted on the agency's website. (Doc. 29 at 20-21); *see Fact Sheet #73: Break Time for Nursing Mothers, available at* https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/whdfs73.pdf (revised April 2018).

[6] Five of Moore's claims touch on her attempts to exercise rights under FMLA. To the extent Moore relies on FMLA violations to show racial discrimination or retaliation, those claims fail because—as previously discussed—Moore has not alleged an adverse employment action. This rationale applies to Counts I, II, IX, and XI. Count VIII appears to raise a substantive FMLA interference claim.

plaintiff need only demonstrate that he was entitled to but denied the right." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1208 (11th Cir. 2001). A complaint failing to allege entitlement to, and denial of, a right under the FMLA fails to state a claim for interference. *See Shanks v. Potter*, 451 F. App'x 815, 818 (11th Cir. 2011).

Here, Moore relies on her allegations regarding her 2019 cancer diagnosis to show FMLA interference. Specifically, Moore alleges: (1) Sparks and Lt. Peterson told her to submit more paperwork to show entitlement to FMLA protections; (2) Peterson said her doctor needed to amend her FMLA restrictions to allow her to work more hours; (3) Sparks asked her work more than her FMLA restrictions allowed; (4) Sparks said he did not "like or appreciate her having longer, FMLA agreed-upon weekends,"; (5) Sparks altered her work schedule to prevent her from having consecutive days off; (6) Lt. Peterson authorized Sparks to schedule Moore "as needed,"; (7) and Moore had to complete a drug test and fit for duty assessment.

While the foregoing facts are sufficient at the motion to dismiss state to show Defendants did not welcome Moore's efforts to secure rights under the FMLA, they do not allege Moore was actually denied any FMLA right to which she was entitled. Accordingly, the Second Amended Complaint fails to state a claim for FMLA interference.

C.      <u>**Homewood's § 1983 Liability and Motion to Strike**</u>

Much of the briefing is devoted to the question of Homewood's liability under § 1983.  (Doc. 27 at 15-18; Doc. 29 at 5-10; Doc. 30 at 7-9).  Plaintiffs contend Homewood is subject to liability for failure to train or supervise.  (Doc. 29 at 5).  In light of the foregoing conclusions that Plaintiffs have failed to state a claim for any underlying violation of their rights, the court not need address whether the Second Amended Complaint alleges a basis for liability due to Homewood's alleged failure to train its employees.  *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  Section 1983 does not confer any substantive rights but merely acts as a vehicle for bringing claims against government actors who have violated the United States Constitution or its laws.  Therefore, "one cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything." *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979).

Finally, the facts Plaintiffs rely on to show Defendants' failure to train or supervise are the subject of Defendants' motion to strike, which is incorporated into the motion to dismiss.  (Doc. 27 at 28-30).  The motion is aimed at the allegations included in paragraphs 11-27 and 133-151 of the Second Amended Complaint, which describe examples of Homewood's participation in, or acceptance of, racist occurrences.  In light of the conclusion that Plaintiffs have failed to state a claim, it

is unnecessary to address these arguments.  The motion to strike is **DENIED** as **MOOT**.

## V.     CONCLUSION

For all of the foregoing reasons, Plaintiffs have failed to state a claim upon which relief can be granted.  While Plaintiffs' response includes a bare-bones request to amend as an alternative to dismissal, amendment would be futile.  (*See* Doc. 29 at 22).   The deficiencies in Plaintiffs' claims, described above, were noted in Defendants' motion to dismiss the first amended complaint.  (Doc. 7).  Plaintiffs' Second Amended Complaint stands on those allegations, as does their response in opposition to the instant motion to dismiss.  Accordingly, Defendants' motion to dismiss is due to be granted in its entirety and Plaintiffs' claims are due to be dismissed.

A separate order will be entered.

**DONE** this 26th day of March, 2021.

*Staci G. Cornelius*

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE